United States District Court
Southern District of Texas
**ENTERED**
August 17, 2026
Nathan Ochsner, Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| Nicolas Garcia, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| v. | § | Civil No. 4:26-cv-3509 |
| | § | |
| Todd Blanche, *et al.*, | § | |
| | § | |
| Respondents. | § | |

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

Before the Court is Respondents' Motion for Summary Judgment. Doc. 11. For the reasons set forth below, the Motion is GRANTED. The Petition is DISMISSED WITHOUT PREJUDICE to re-filing a due process challenge to prolonged future detention and DISMISSED WIH PREJUDICE in all other respects.

## I. FACTUAL AND PROCEDURAL HISTORY

Petitioner Nicolas Garcia is a native and citizen of Cuba who has resided in the United States since May 4, 1980. Doc. 1 ¶ 2. Petitioner was initially paroled into the country under the Cuban Adjustment Act. *Id.* ¶ 3. Between 1989 and 2000, Garcia was convicted of four felony offenses, including attempted grand larceny and attempted criminal sale of a controlled substance. Doc. 11-1 ¶¶ 6–8, 11. Based in part on these convictions, Petitioner was ordered removed to Cuba in 2002. Docs. 1 ¶ 4; 11 at 2–3. The

Department of Homeland Security, however, released Petitioner back into the country and placed him on an Order of Supervision ("OSUP") in August 2008.[1] Docs. 1 ¶ 4, 3 at 3.

On November 4, 2025, DHS re-detained Petitioner pursuant to 8 U.S.C. § 1231(a) in order to facilitate his removal. The following month, the Cuban government denied the Unites States' request for Petitioner's repatriation. Doc. 11-1 ¶ 17. In response, DHS began pursuing Petitioner's removal to Mexico, but he refused to cooperate with those removal efforts. *See generally* Doc. 11-1. Specifically, in December 2025, Petitioner refused to sign to acknowledge his receipt of a Notice of Third Country Removal Form, which informed him of DHS's intention to remove him to Mexico. *Id.* ¶ 19. During the subsequent two months, Mexico temporarily refused Petitioner entry due to his aforementioned criminal history and assorted medical conditions—that being arthritis, hypertension, and obesity. *Id.* ¶¶ 20–23. When Respondents again initiated removal efforts to Mexico in March and April of 2026, Petitioner refused removal to Mexico and declined to sign both a Warning for Failure to Depart Form (Form I-229a) and a second Third Country Notice of Removal Form. *Id.* ¶¶ 25–26.

As a result of Petitioner's obstructive conduct, DHS submitted requests for acceptance to three additional countries in June 2026: Costa Rica, the Dominican Republic,

---

[1] Because Petitioner's current detention period exceeds six months, the Court need not address whether he should receive credit for prior time spent in immigration custody. *See Jillani v. Blanche*, 4:26-cv-4550 (S.D. Tex. July 28, 2026) (declining to aggregate detention periods absent evidence of a deliberate pattern of catch-and-release to elude judicial scrutiny).

and Honduras. *Id.* ¶ 29. The Dominican Republic immediately informed DHS that it was not currently accepting third country nationals, but DHS continues to work with Costa Rica and Honduras to effectuate Petitioner's removal. *Id.* ¶ 31. The Court notes that both Costa Rica and Honduras have accepted Cuban citizens in recent years. *Id.* ¶ 32.

During these removal negotiations, Petitioner has remained in the custody of Respondent, Warden of the Montgomery Processing Center Detention Facility, in Conroe, Texas.[2] *Id.* ¶¶ 7, 26. Petitioner filed a petition for a writ of *habeas corpus* under 28 U.S.C. § 2241 on the grounds that his present detention violates due process under *Zadvydas v. Davis*, 533 U.S. 678 (2001).[3] Doc. 1. Respondents contend that Petitioner's detention remains lawful because his removal is significantly likely to occur in the reasonably foreseeable future. Doc. 11 at 1.

## II. ANALYSIS

Petitioner's current detention does not violate the Fifth Amendment's Due Process Clause or the Immigration and Naturalization Act ("INA"). Not only has Petitioner failed to carry his initial burden under *Zadvydas*, but Respondents have also offered sufficient summary judgment evidence to demonstrate that Petitioner is significantly likely to be removed from the country in the foreseeable future. Either one of these two grounds would be a sufficient basis to deny Garcia's Petition. Here, both exist.

---

[3] Petitioner does not specify whether his detention without a bond hearing violates substantive or procedural due process. *See* Doc. 1 ¶¶ 50–71. The Court assumes that Petitioner intends to raise both due process challenges.

Under *Zadvydas*, an alien carries the initial burden to provide "good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future." 533 U.S. at 701. Only after the alien carries this burden must the Government respond "with evidence sufficient to rebut that showing." *Id.* And because *Zadvydas* is best construed to restrict detention that "d[oes] not serve its purported immigration purpose"—where removal is "no longer practically attainable"—this Court has adopted specific guidelines to govern this burden-shifting framework.[4] *See Avadanei v. Frink*, 4:26-cv-2177 (S.D. Tex. July 31, 2026) (quoting *Demore v. Hyung Joon Kim*, 538 U.S. 510, 527 (2003)).

First, to carry his initial burden, an alien "must demonstrate that the circumstances of *his* status or the existence of particular *individual* barriers . . . are such that there is no significant likelihood of removal in the reasonably foreseeable future." *Idowu v. Ridge*, No. 3:03-CV-1293, 2003 WL 21805198, at *4 (N.D. Tex. Aug. 4, 2003) (Ramirez, J.) (internal quotes omitted) (emphases added). Speculation, conjecture, or "lack of visible progress" are not enough. *Id.* Rather, an alien must make a non-conclusory showing that "ICE is incapable of executing his removal" in the "near future." *Nagib v. Gonzales*, No. 3:06-CV-294, 2006 WL 1499682, at *3 (N.D. Tex. May 31, 2006) (Sanderson, J.).

[4] The Court outlined its rationale for adopting these standards in greater detail in its *Avadanei* decision. For ease of reading, the Court reiterates the standards that it articulated in *Avadanei* without citing directly to that Order for each proposition. *See Avadanei v. Frink*, 4:26-cv-2177, slip op. at 3–10 (S.D. Tex. Jul. 31, 2026).

Second, once the burden has shifted, the Government cannot succeed merely by showing that it has made "good faith efforts" and removal is not "impossible." *Surovtsev v. Noem*, No. 1:25-cv-160, 2025 WL 3264479, at *7 (N.D. Tex. Oct. 31, 2025) (Hendrix, J.) (quoting *Zadvydas*, 533 U.S. at 702). But DHS also need not immediately produce detailed plans to effectuate the alien's removal to another country. Instead, if the agency identifies third country removal as a reasonable alternative, "[t]he Court is obligated to 'giv[e] due weight to the likelihood of successful future negotiations" with those countries. *Id.* (quoting *Zadvydas*, 533 U.S. at 702). Considering the Trump Administration's commitment to third country removals,[5] this Court "has no reason to believe that these [removal] efforts will be unsuccessful." *Avadanei v. Frink*, 4:26-cv-2177, slip op. at 8 (quoting *Misirbekov v. Venegas*, 796 F. Supp. 3d 436, 439 (S.D. Tex. 2025)). Indeed, DHS's energetic and expansive search for third country alternatives in this particular case convinces this Court that Petitioner's "removal to a third country is likely in the foreseeable future." *See id.*

Had this fact pattern occurred during a previous administration, the Cuban government's refusal to repatriate Petitioner would have prompted many district courts to immediately shift the *Zadvydas* burden onto the Government. *See* Doc. 11-1 ¶ 17. But even

---

[5] One tracker estimates that immigration judges issued 8,777 third country removal orders in March 2026 alone. 4 Mobile Pathways, Third Country Removals, https://www.mobilepathways.org/dashboards/third-countryremovals (last visited July 27, 2026).

if Petitioner's criminal history and (relatively common)[6] medical issues prevent his removal to his native country of Cuba, DHS has acted with speed and care to identify suitable third country removal alternatives for Petitioner, and Petitioner has not shown good reason to believe that his removal to *those* countries is not significantly likely to occur in the reasonably foreseeable future. *See generally id.*

DHS first sought to remove Garcia to Mexico, but Petitioner's repeated obstructive conduct protracted those negotiations and prevented his immediate removal.[7] *See id.* ¶¶ 19–23, 25–26. In June 2026, DHS contacted Costa Rica, the Dominican Republic, and Honduras as alternatives to Cuba and Mexico. *Id.* ¶ 29. Although the Dominican Republic informed DHS that it was not currently accepting third country nationals, DHS continues

---

[6] The Court notes that, per the Center for Disease Control, nearly half (48.8 percent) of American adults have hypertension, two in five (40.3 percent) are clinically obese, and one in five (21.3 percent) have been diagnosed with arthritis. High Blood Pressure Facts, Center for Disease Control (June 2, 2026), https://www.cdc.gov/high-blood-pressure/data-research/facts-stats/index.html; Obesity and Severe Obesity Prevalence in Adults: United States, August 2021-August 2023, Center for Disease Control (September 24, 2024), https://www.cdc.gov/nchs/products/databriefs/db508.htm; Arthritis, Center for Disease Control (December 11, 2025), https://www.cdc.gov/nchs/fastats/arthritis.htm. In other words, Petitioner's medical concerns are neither particularly novel nor complex.

[7] Respondents previously represented that Petitioner would be removed to Mexico on or about August 5, 2026. *See* Doc. 15. Respondents' representation was unsupported by competent summary judgment evidence, and Petitioner has not since been removed to Mexico. *See* Docs. 15, 18. The Court need not, and does not, construe the failed attempt as evidence of individual barriers to Petitioner's removal to Mexico or any other third country. The law does not compel the Government to identify a specific date and time for removal. *See Zadvydas v. Davis*, 533 U.S. 678 (2001). Instead, to the extent Respondents' representation is relevant, the fact that DHS targeted a specific country and date for Petitioner's removal is evidence that the Government is still engaged in serious efforts to effectuate Petitioner's removal to Mexico—further buttressing a finding that Petitioner is significantly likely to be removed to a third country—whether to Mexico, Costa Rica, or Honduras—in the reasonably foreseeable future.

to actively work with Costa Rica and Honduras to secure Petitioner's removal. *Id.* ¶ 31. The Court notes that since the Trump Administration began pursuing third-country removals in 2025, DHS has successfully deported 15 Cuban citizens to Costa Rica and Honduras. *Id.* ¶ 32. The Court sees no reason why Petitioner could not be the sixteenth such removal. Similarly, Petitioner has not articulated why *his* status or *individual* barriers render removal to these countries unlikely. *See Idowu*, 2003 WL 21805198, at *4 (internal quotes omitted) (emphases added). Speculative "lack of visible progress" in those negotiations over the past two months cannot suffice to shift the burden onto the Government. *See id.* Therefore, because Petitioner has not shown that "ICE is incapable of executing his removal" in the "near future," he has failed to carry his initial burden under *Zadvydas*. *See Nagib*, 2006 WL 1499682, at *3.

Even if Petitioner had satisfied his initial burden under *Zadvydas*, the Government has offered sufficient evidence to rebut any question regarding the imminence of his removal. *See Zadvydas*, 533 U.S. at 701; Doc. 11. As noted above, Respondents are actively engaged in negotiations with Costa Rica and Honduras, two target countries that have consistently accepted Cuban nationals in recent years. Doc. 11-1 ¶¶ 29, 31–32. Because DHS has identified third country removal to these nations as a reasonable alternative, "[t]he Court is obligated to 'giv[e] due weight to the likelihood of successful future negotiations.'" *Surovtsev*, 2025 WL 3264479, at *7 (quoting *Zadvydas*, 533 U.S. at 702). Given that Respondents initiated negotiations with Costa Rica and Honduras just two months ago, and only after Petitioner's obstructive conduct prevented his removal to

Mexico, the Court defers to DHS to expeditiously finalize an agreement to remove Petitioner to one of those countries. At this early juncture, to inquire further as to the speed of those efforts would violate the well-established principle that courts must "recognize primary Executive Branch responsibility" over immigration matters. *Zadvydas*, 533 U.S. at 700.

In sum, Petitioner has failed to offer good reason to believe that his removal is not significantly likely to occur in the reasonably foreseeable future. Moreover, even if he had, the Government has adduced evidence suggesting that Garcia's removal to a third country is, in fact, imminent. Therefore, Petitioner's detention remains consistent with 8 U.S.C. § 1231(a)(6) and has not yet arisen to a due process violation under *Zadvydas*.

## III. CONCLUSION

For the foregoing reasons, DHS has acted within its discretion under 8 U.S.C. § 1231(a)(6) by continuing to detain Petitioner. His detention violates neither the INA nor due process. Therefore, Respondents' Motion for Summary Judgment is GRANTED. The Petition is DISMISSED WITHOUT PREJUDICE to raising a due process challenge if detention unreasonably continues and DISMISSED WITH PREJUDICE in all other respects. The Clerk of Court is directed to CLOSE this case. A final judgment will be entered separately.

**SO ORDERED.**

**SIGNED** at Houston, Texas, on the 17th of August, 2026.

Nicholas J. Ganjei
United States District Judge